Wardlaw, J.
delivered the opinion of the Court.
This Court has carefully considered the various questions that have been presented in this case, and will announce its opinion upon most of them, especially those about which some rule is needed for the guidance of Magistrates and Freeholders, amidst contradictory opinions that have been given. It. will be seen that the case in hand might have been disposed of with less trouble.
1. The Court for the trial of Nicholas was properly organized, it being lawful, indeed requisite, that two Magistrates should have been present therein. The peculiar system esT tablished for these Parishes of St. Philips and St. Michael, (6 Stat. 328, 1827; 418, 1830; 457, 1832; 486, 1833,) as it existed prior to the Magistrate’s Act of 1839, remained unchanged by that Act, according to the exception made in its 32d section. It would be tedious to recite the various sections of Acts which have led to this conclusion, in opposition to the strong argument contained in the report of the Circuit Judge. We will therefore give only the results attained by our examination of them. The general law then existing concerning the trial of persons of color, (to wit, certain clauses of the negro Act of 1740,) which is referred to by the Act of 1832, above cited, is incorporated with that Act, and made part of it, as much so as if the provisions of that general law had been repeated and re-enacted as part of the peculiar system which was amended by the Act of 1832. The alterations of that general law then made for the peculiar system,, are inconsistent with the new general law which was enacted for the rest of the State by the Act of 1839. For instances: The Act of ’32 requires, in capital cases, the unanimous concurrence of the Freeholders: the Act of ’39 requires the concurrence of only four out of five: by the Act of ’32, in a case not capital, a majority of the Freeholders with the Magistrate, or all the Freeholders without the Magistrate, may give judg-' ment against the accused : by the Act of ’39, the Magistrate and at least four Freeholders must always concur, to give such judgment. If, then, the Act of ’39 be applied at ail to the trial of slaves within these Parishes, it should be applied *287 without the modifications of ’32, for they are inconsistent with it; but this would be a manifest interference with the law relating exclusively to these Parishes, which is forbidden by the exception aforementioned. ,
Moreover, the Act of ’39 requires proceedings by the Magistrate “before whom the complaint is made” inconsistent with the division of duties in these Parishes between the judicial and the ministerial Magistrates. By the Act of ’39, Freeholders are required: in the Parishes, by the 15th section of the Act of ’30, above cited, slaveholders are competent, even although they should not be Freeholders. By the Act of ’39, five Freeholders are required in all cases: by the 5th section of the Act of ’30, three Freeholders or slaveholders are directed to sit in cases not capital.
The great difference which might be made in the result of the same case, first where the concurrence of the only Magistrate and all the Freeholders was required, (as would be if we attempted to engraft the Act of ’39 upon the modifications of ’32,) and second, when only the concurrence of one out of two Magistrates with all the Freeholders was required, (as certainly was the case in the Parishes when the Act of ’32 was adopted,) shows that it is not unimportant whether one or two Magistrates form part of the Court. In this respect the case before us (and every case of the trial of a person of color, in these Parishes or in any other part of the State,) differs widely from the case of Blum & Cobia v. Sharlock, (MSS. Charleston, Feb. 1841,) where, upon the investigation of a prisoner’s right to the benefit of the Prison Bounds Act, upon a trial before a jury, two Commissioners of Special Bail sat instead of one.
2. We agree with the Circuit Judge that the 4th section of the Act of ’30 is, by necessary implication, repealed by the Act of ’32: and that in these Parishes (according to what has been the law and the usage in other parts of the State,) the Magistrate or Magistrates who form part of a Court for trial of a person of color, may and should consult and confer freely with the other members of the Court, in forming their judgment : and that according to what, after due conference, may be ascertained to be the opinions of the various members of the Court, should judgment be rendered against the accused, if the concurrence required by law exist, or for the accused, if it do not exist. What is by our Acts called, and what we here call the judgment of a Court for the trial of a person of color, is not a conclusion of the law itself, following an ascertained state of facts, nor a sentence pronounced according to the discretion of a Judge, after a conviction before a jury: *288 but all the members of such a Court, in coming to their judgment, consider not only the question of guilt, but if there be-guilt, the degree of it, and the measure of punishment according to the circumstances. The judgment is often, of necessity, a compromise of opinions upon all the questions submitted; and in forming it, it is essential that those who must concur in rendering it, should be unrestrained in their conferences.
3. The foreman of the Freeholders has certified that the 18th section of the Act of 1751 was not brought to his notice on the trial, and he was not aware of it: the Magistrates are of opinion that the power to mitigate the punishment was fully brought to the notice of the Freeholders, without any special reference to the Act of 1751 or any other law. This opinion of the Magistrates may arise from their consciousness that they themselves knew the law, and may well consist with what is stated by the Freeholder. In a case like this, where the heaviest of penalties was to be imposed for an of-fence which we cannot say came clearly within the 24th section of the Act of 1740, it is all important that the extent of the discretion which might have been exercised over the punishment should have been fully understood.
The 18th section of the Act of 1751 was omitted by Judge Grimke (P. L. 217). tie published only the 14th section, saying that the rest of the Act expired by its limitation; but the 18th section was virtually revived, by a revival Act of 1783, Judge Brevard (2 Brev. Dig. 245,) following the public laws, published only the 14th section. The remainder of the Act of 1751 was then hidden from public view until the publication of the statutes at large; yet, although its 18th section is the only law which ever existed authorizing the mitigation of punishment in the trial of slaves for ordinary capital of-fences, somehow a pretty general practice has prevailed in conformity with that section. Great doubts have however prevailed, whether the 18th section is of force; and we can readily believe that it was altogether unknown to the Freeholders in this case.
Is this 18th section of force ?
The Act of 1740, “for the better ordering and governing negroes and other slaves in this Province,” was, by its original terms, limited to three years (7th Stat. 417). In 1751 (7th Stat. 420,) was passed “An additional and explanatory Act to an Act of the General Assembly of this Province, entitled £ An Act for the better ordering and governing ne-groes and other slaves in this Province,’ and for continuing such part of the said Act as is not altered or amended by this *289 present Act for the term therein mentioned,” whereby the said additional and explanatory Act itself, and “such part of the Act of 1740 as is not altered or amended” thereby, were continued for seven years. The Act of 1751 contains various substantive provisions additional to the system of slave law enacted in 1740 — concerning runaways, fire-arms, beating of one slave by another, poisoning, negro doctors, dealing in rice or corn, lunatic slaves, compensation to owners of slaves executed, and fines and forfeitures; (most of which have been rendered unimportant by subsequent legislation.) Its 14th section, expressly referring to the 17th paragraph of the Act of 1740, confirms the portion of that paragraph which relates to slaves endeavoring to entice other slaves to run away, to cases where the intention shall be manifested by actual preparation of provisions, arms, &c, • and the 18th section is as follows:
“And whereas, upon the trials of slaves in this Province, it hath sometimes happened that certain circumstances have attended the facts upon such trials, as would have induced the Justices and Freeholders to have mitigated the punishment, but being strictly bound by the letter of the law, such slaves have suffered death: Be it therefore enacted, by the authority aforesaid, that in all and every trial hereafter for any oifen'ce committed' by any negro or other slave against the said recited Act [of 1740] or against the present Act, it shall and may be lawful to and for the Justices and Freeholders, upon such trial, or a majority of them, to mitigate the punishment to be inflicted upon the offender, in all and every case where any favorable circumstances shall appear, and induce them to be of opinion that such punishment ought to be mitigated; any thing in the said recited Act, or in this present Act, to the contrary thereof, in any wise notwithstanding.”
It will be seen that the question is, whether the 18th section is not au alteration of the Act of 1740.
In 1757, 4 Stat. 46 — 1759, 4 Stat. 97 — and 1765, 4 Stat. 208, in a large list of Acts which in each of these years were continued for limited periods, are mentioned the Act of 1740, ■(“except such parts thereof as are altered by an Act of 1754, entitled £ An Act to prevent the inveigling, stealing and carrying away negroes and other slaves in this Province, and to prevent the carrying away of schooners and pettiavgars ;’ and also for repealing so much of an Act entitled £ An Act for the better ordering and governing of negroes and other slaves in this Province, as relates to the time ivithin which offenders that are apprehended shall be tried; and giving *290 the Justices and freeholders a power to postpone the trial of such offenders,’ — and by the additional and explanatory Act of 1751,”) and also the Act of 1751.
In 1763, 4 Stat. 294, and 1775, 4 Stat. 333, in lists of Acts continued, is mentioned the Act of 1740, “except such parts as were repealed, altered or amended by the Act of 1754, in the Act of 1751but the Act of 1751 is not itself expressly included in the lists.
In 1776, 4 Stat. 348 — 1777, 4 Stat. 382 — in 1779, 4 Stat, 472, in lists of continued Acts, is mentioned the Act of 1740, “provided that such parts and clauses of the said last mentioned Act be hereby excepted and not continued or enforced, as are altered or repealed by the Act of 1754, or by the explanatory Act of 1751.”
In 1782, 4 Stat, 529, expired Acts are continued until the -next; and in 1783, 4 Stat. 540, in a list of various Acts which are declared to be of force until repealed, amended or otherwise altered by the Legislature, is the Act of 1740, “provided that such parts and clauses of the said Act be hereby excepted and not continued or enforced as are altered or repealed by the [Act of 1754,] explanatory Act to the same, passed 1751.”
Now if the 18th section of the Act of 1751 be any alteration of the Act of 1740, and by reason of the alteration both the alteration itself and the part altered be excepted from revival and continuance, it follows that there is no law in the State for punishing a slave capitally for any of the capital of-fences which are provided for by the Act of 1740, and not by any subsequent Act — and such are almost all the capital of-fences we know of: for the Act of 1740, in case of the conviction of a slave of any such offence, requires the Court of Magistrates and Freeholders to pronounce sentence of death without regard to circumstances, just as a Judge of the Circuit Court must do after conviction of a free white person of a capital offence; and surely this is altered by the Act of 1751. But if the 18th section aforesaid be an alteration of the Act of 1740, and we hold that the Act of 1740 is perpetuated as it stood modified by the alterations and repeals which were contained in the Acts of 1754 and 1751, wo have a construction leading to a reasonable result. Is not then this 18th section an alteration of the Act of 1740? It seems only necessary to read it, to see that it is; and the same reasons which induced former publications of the 14th section of the Act of 1751, apply to the 18th section. Being then clearly of opinion that the 18th section of the Act of 1751 is of force, we see in the strong probability that the power given by it *291 Was not understood by the Freeholders, sufficient reason for approving the order which h'as been made for a new trial in this case, although we do not assent to the ground upon which the Circuit Judge placed the order.
4. This Court has attained no distinct conclusion as to the meaning of the words •“ if any slave shall grievously wound, maim or bruise any white person,” as in the 24th section of the Act of 1740: but seeing that the offence pointed out is, by the section, equivalent to three .several presumptions.; striking of white persons ; that the punishment is death, and that temporary excitement may sometimes mislead Magistrates and Freeholders as to the meaning of the Legislature, all the members of this Court agree that the grievous ivounding, maiming or bruising, must be done with evil intent, and be severe: and that the degree of severity is not sufficiently expressed by saying that “it must inflict pain, distress and suffering,” although it is hard by many words to attain the precision which is desirable. Some of us think that this grievous wounding, maiming or braising must be such as ensues from an attempt to commit murder or other felony, and is likely to endanger life.
5. This Court perceives that the 3d section of the Act of 1833, (6 Stat. 489,) which is the first and only Act that has given an appeal from a Court of Magistrates and Freeholders held for the trial of a slave, gives the appeal to a Judge, and not to a Court, and so is like the Act concerning apprentices, which was considered in the case of Carmand v. Wall, 1 Bail. 209. But without resolving that an appeal from a Judge, even at Chambers, must be expressly given, to be entertained, we observe that by the Act of 1833 the appeal is to a Judge, given only in case of conviction., and that if a new trial be •ordered, proceedings “as in case of a new complaint” are directed, which contemplate no attempt to control the Judge, It may have been thought safe to trust the discretion of a Judge: his refusal to interfere may have been considered sufficient assurance that justice would be done by execution of the sentence; and obedience to an order for new trial, even granted unadvisedly by him, may have been supposed to be ,a less evil than an attempt to reverse it by appeal to the highest tribunal. But without determining whether or no an appeal from the Judge shall be heard in behalf of the accused, ¡this Court is of opinion that under the terms of the Act of 1833, and the uniform usage in the administration of ordinary criminal law, such appeal is no.t given to the State.
An appeal to this Court lies from a Judge’s order in case ¡of prohibition, and it has been urged that the Judge, upon *292 appeal to him from the Court of Magistrates and Freeholders, is bound to confine his inquiries to matters of fact, and cannot interfere for any want of jurisdiction, irregularity in the organization of the Court, error in law, or other matter which might have been the subject of prohibition; or that if he does so interfere, where prohibition would have lain, an appeal must lie from his decision in one form as in the other. It seems to this Court that the Act of 1833 intended to give to the Judge a supervisory control over the inferior tribunal, by an easy and expeditious proceeding, and to authorize him, whenever, from the record of the proceedings of the inferior tribunal, or from proper affidavits of matters aliunde, the conviction should appear to him “to have been erroneous,” to set aside what had been done, and direct that the prosecution should begin anew. The technicalities of prohibition were avoided also whenever he saw a case where the sentence of death, which was pronounced, ought not, in his opinion, whether for error in law, or error in fact, to be executed upon the day appointed by the inferior Court, or such other day as he may have appointed, under his power to suspend the execution until a decision of the appeal should be had.
The appeal to a Judge was a humane provision, which has sometimes saved the innocent, and even frequently prevented the irregular or excessive punishment of the guilty. An appeal from the Judge might have the effect of preventing evil legislation to purposes of delay and injustice. It would be almost impossible in practice to exclude the appeal to this Court in every case, upon the allegation that some ground proper for prohibition was involved, if it were allowed in any: and there seems no good reason why the discretion of a Judge (which at last can only order a new trial,) should be less trusted in law than in fact. Therefore, without speaking of the other side, we are of opinion that in no case does there lie, in behalf of the State, an appeal from an order of a Judge granting a new trial under the Act of 1833.
This Court, then, finding that the order made by the Circuit Judge is such as it would have granted, although for reasons different from that he has assigned, is gratified to perceive that under the conclusions which have been attained, the order must stand. The motion is dismissed.
Richardson, J. G’Neall, J. Evans, J. and Frost, J* concurred.
Withers, J. absent.
Mption refused.